**2016 BNH 006**   Note: This is an unreported opinion. Refer to LBR 1050-1 regarding citation.
_____

# UNITED STATES BANKRUPTCY COURT
# DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| In re: | Bk. No. 09-10671-BAH |
| | Chapter 7 |
| James B. Shaw, | |
|     Debtor | |
| | |
| Brenda J. Greene, as Executrix | |
| of the Estate of Brian H. Shaw, | |
|     Plaintiff | |
| | |
| v. | Adv. No. 11-1101-BAH |
| | |
| James B. Shaw, | |
|     Defendant | |

| | |
|---|---|
| *Richard C. Mooney, Esq.* | *Sandra A. Kuhn, Esq.* |
| *Richard C. Mooney & Associates, P.C.* | *Gregory A. Kalpakgian, Esq.* |
| *Concord, NH* | *Family Legal Services* |
| *Attorney for the Plaintiff* | *Concord, NH* |
| | *Attorneys for the Defendant* |

## MEMORANDUM OPINION

### I. INTRODUCTION

The matter before the Court is the complaint filed by the plaintiff Brenda J. Greene ("Greene"), as Executrix of the Estate of Brian H. Shaw ("Shaw"), against defendant James B. Shaw (the "Debtor"). Shaw was the Debtor's father. Greene seeks a determination that a debt for contribution owed by the Debtor to Shaw's probate estate is excepted from discharge pursuant to 11 U.S.C. § 523(a)(2)(B). The Court conducted a trial on March 1, 2016, at which the Debtor and Greene testified, and nine exhibits were admitted into evidence. At the close of

Greene's case, the Debtor orally moved for judgment on partial findings pursuant to Fed. R. Civ. P. 52(c), made applicable to adversary proceedings by Fed. R. Bankr. P. 7052. For the reasons set forth below, the Court grants the Debtor's oral motion.

**II. JURISDICTION**

This Court has authority to exercise jurisdiction over the subject matter and the parties pursuant to 28 U.S.C. §§ 157(a), 1334, and U.S. District Court for the District of New Hampshire Local Rule 77.4(a). This is a core proceeding under 28 U.S.C. § 157(b).

**III. FACTS**

A. Procedural History

The Debtor filed a voluntary Chapter 7 petition on February 28, 2009. On Schedule D – Creditors Holding Secured Claims, the Debtor listed the United States Department of Agriculture (the "USDA") as holding a secured claim in the amount of $68,000.00 secured by a "1192 Kenworth Truck, Tractor." The Debtor did not list Shaw's estate as either a creditor or co-debtor on his schedules. On Schedule B – Personal Property, the Debtor listed a "[p]otential will contest of father's will" as an asset. After appearing at the meeting of creditors held pursuant to 11 U.S.C. § 341(a) on April 8, 2009, the Debtor received a discharge on July 2, 2009. The Chapter 7 trustee filed a Report of No Distribution on January 26, 2010, and the case was closed on March 3, 2010.

On May 16, 2011, the Debtor moved to reopen his case to list Shaw's estate on Schedule F – Creditors Holding Unsecured Nonpriority Claims and Schedule H – Codebtors. The motion to reopen was accompanied by amended Schedules F and H. The Court granted the motion to

2

reopen on May 17, 2011, and set a deadline of August 15, 2011, for Greene to file a complaint objecting to the Debtor's discharge or the dischargeability of the debt owed to Shaw's estate.

Greene commenced the present adversary proceeding on August 15, 2011. Her complaint is not a model of clarity. Generally, Greene alleged that the Debtor defrauded both the USDA and Shaw when, in connection with a 2007 loan transaction with the USDA Farm Service Agency in which both the Debtor and Shaw were co-debtors (the "2007 FSA Loan"), the Debtor listed on a security agreement certain equipment that he claimed to own, including a Massey Ferguson mower, but which he had already sold to third parties several years earlier.[1] Moreover, she alleged that in furtherance of that fraud, the Debtor, either intentionally or with reckless indifference to the truth, failed to: (1) list Shaw as a co-debtor on his Schedule H; (2) list certain "secured assets" on his Schedules or Statement of Financial Affairs; (3) give Shaw's estate notice of his bankruptcy; and (4) testify truthfully at the meeting of creditors.[2] In the complaint's first paragraph, Greene requests a judgment "denying the [Debtor's] discharge . . . pursuant to 11 U.S.C. § 523(2)(b) [sic],"[3] but the prayer for relief requests a finding that the Debtor "is not entitled to a discharge of the claim owed to [Greene] pursuant to 11 U.S.C. § 523(2)(b) [sic]."[4] Although the complaint repeatedly references a non-existent "11 U.S.C. § 523(2)(b)," Greene states that particular section "provides that the Court will not discharge any debt obtained by false pretenses, a false representation, or actual fraud."[5]

On September 29, 2011, the Debtor filed an answer admitting that he failed to list Shaw's estate on Schedule H, but denying the remainder of Greene's allegations. A pre-trial scheduling

---

[1] Doc. No. 1 at ¶¶ 7-8, 14-15.

[2] Id. at ¶¶ 6, 9, 15.

[3] Id. at 1.

[4] Id. at ¶ A.

[5] Id. at ¶ 13.

3

order entered on October 20, 2011, to which the parties sought several extensions. On February 6, 2013, both parties filed pretrial statements. Notably, while the Debtor proceeded with the understanding that Greene meant 11 U.S.C. § 523*(a)(2)(B)* in her complaint, Greene's pretrial statement further muddied the waters. Her "Statement of Law" included references to 11 U.S.C. § 727(a)(4)(A), a count not brought in her complaint, and 11 U.S.C. § 523(a)(2).[6] By her own description, however, Greene stated "[t]he Complaint alleges that the Debtor violated Section 523(2)(b) when the Debtor intentionally did not list [Shaw's estate] as a co-debtor on Schedule H and gave no notice to [Shaw's estate], and therefore is seeking discharge of the debt owed to [Shaw's estate] by false pretenses, a false representation, or actual fraud."[7]

The Court conducted a pre-trial conference on April 23, 2013. In light of the confusion caused by Greene's pleadings, the Court asked her to clarify the nature of her claim on the record, warning that the representations made would be binding. In response, Greene's counsel explained that Greene sought, as the representative of Shaw's estate, a determination that a debt owed to Shaw for contribution on account of the 2007 FSA Loan was nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(B) because the Debtor concealed from Shaw at the time they executed the security agreement the fact that he no longer owned some collateral identified therein.

After numerous continuances to facilitate the parties' unsuccessful attempts to secure a witness from the USDA, the matter was finally tried on March 1, 2016. Greene called two witnesses—the Debtor and herself. Nine exhibits were admitted into evidence. At the conclusion of Greene's case, the Debtor orally moved for judgment on partial findings pursuant to Fed. R. Civ. P. 52(c), made applicable to adversary proceedings by Fed. R. Bankr. P. 7052.

---

[6] Doc. No. 38 at ¶¶ 19-20.

[7] Id. at ¶ 9.

After oral arguments from both parties, the Court took the matter under advisement, indicating its intention to enter judgment in favor of the Debtor after memorializing its findings.

### B. The Trial Record

At all times relevant to this adversary proceeding, the Debtor has been self-employed. He owned James B. Shaw Property Maintenance, a company through which he provided mowing, plowing, and other "farm work" services. In winter, when the property maintenance business was slow, the Debtor would supplement his income driving tractor trailers. For two years the Debtor also operated a detailing shop in Andover, New Hampshire, but that business closed in 2003 or 2004.

In 2004, the Debtor moved in with Shaw. Shaw lived in a house in Andover, New Hampshire, across the street from a two hundred acre dairy farm owned by his parents, Hale and Yvette Shaw. Shaw had purchased the dairy business from his parents, including the equipment, but they continued to own and reside on the land.

At this time, the Debtor and Shaw enjoyed a good relationship with one another. In light of the complimentary nature of their businesses, they often worked together. They did not own interests in each other's businesses, but would "swap services." The Debtor testified that he worked with his father part-time most of the year, and essentially full-time in the summer.

In 2002, the Debtor financed the purchase of a Massey Ferguson tractor (the "MF Tractor")[8] for approximately $60,000.00. The Debtor testified that Shaw appeared on the bill of sale and was a co-obligor on the loan because the Debtor's credit rating prevented him for

---

[8] Not to be confused with the previously mentioned Massey Ferguson mower.

financing the purchase on his own. It appears, however, that the parties considered the MF Tractor the Debtor's sole property and registered it in his name.[9]

In 2003, the Debtor was struggling with debt, including the loan payments on the MF Tractor. The Debtor testified that Shaw recommended that he consolidate his debt through a USDA FSA loan. The Debtor testified that he was unfamiliar with such a loan, but that Shaw explained that the Debtor's grandfather, presumably Hale Shaw, had relied upon FSA loans in the past. The Debtor agreed, and Shaw prepared the necessary documentation.

On March 20, 2003, both the Debtor and Shaw executed a promissory note in favor of the USDA in the amount of $100,460.00 (the "2003 FSA Loan").[10] The loan called for one annual payment in the amount of $8,000.00, and then eight annual payments in the amount of $16,430.00, all due on the first of each year.[11] As part of the transaction, they also executed a security agreement which listed as collateral thirty-three pieces of equipment (the "Collateral Equipment"), the dairy's livestock, and all crops grown on the farm.[12] The Debtor testified that Shaw prepared the collateral list for the security agreement, and that the Debtor simply signed the documents without reading them. Based on the value of the assets pledged, the 2003 FSA Loan was substantially over-collateralized. Indeed, the Debtor testified that he understood the USDA required a two-to-one collateral to loan ratio.

At trial, there was a considerable degree of confusion regarding the ownership of the Collateral Equipment. The Debtor was repeatedly asked whether he was the sole owner of various equipment, including the MF Tractor, to which he typically responded that he could not have been, given that Shaw's name appeared on the relevant bill of sale—although no bills of

---

[9] Ex. 10.
[10] Ex. 1.
[11] Id.
[12] Ex. 2.

6

sale were ever offered into evidence. Matters were further complicated by questions regarding record title because it is unclear, and in fact doubtful, that each piece of equipment had a certificate of title. From the Debtor's testimony, the Court concludes that the Debtor's uncertainty as to whether he was the sole owner of various pieces of equipment was not meant to be evasive, but was a result of the informal nature of the assistance Shaw gave to the Debtor in his role as the Debtor's father and frequent agricultural collaborator. Ultimately, when pressed, the Debtor identified the following Collateral Equipment as solely his: a Case tractor; a Dodge D600 truck; a Dodge pick-up truck; the MF Tractor; a Chevrolet dump truck; and a Kristi trailer. He further testified that Shaw bought him a Ferris mower, which was listed among the Collateral Equipment, but that it remained in Shaw's name.

Notably, the Collateral Equipment list also identified a "Twose" type mower manufactured by "Masse." At trial, the Debtor testified that this description was inaccurate, explaining that the collateral in question was a mower attachment manufactured by Twose and used in conjunction with the MF Tractor. He further testified that Shaw owned the Twose mower.

Shaw took receipt of the loan proceeds and paid all the Debtor's then-outstanding debts. This included retiring the prior loan on the MF Tractor. The Debtor's financial difficulties nonetheless persisted and he often relied on Shaw or Yvette Shaw to make the payments due under the 2003 FSA Loan between 2003 and 2005. As a result, the Debtor testified that Shaw advised him to downsize, and that their USDA loan officer, Lorna Wakefield, had informed Shaw that they could sell some of the Collateral Equipment so long as the collateral to loan ratio remained at least two-to-one.

In 2004, the Debtor sold the MF Tractor for approximately $27,000.00 to $30,000.00. He testified that he did so at Shaw's suggestion and with Shaw's knowledge, because the MF Tractor was never profitable due to the amount of maintenance it required. Although Shaw owned the Twose mower attachment, it was sold along with the MF Tractor in the same transaction. The Debtor testified that he used $12,000.00 of the sale proceeds to purchase a Kenworth tractor truck for the purpose of winter trucking and hauling hay, while the balance was used to partially repay Yvette Shaw and to make a payment under the 2003 FSA Loan.

In a separate transaction in 2004, the Debtor sold the Ferris mower, the Kristi trailer, and the Chevrolet dump truck to a third party in a package deal for approximately $20,000.00. The Debtor testified that Shaw was well aware of the sale, as he was working in the yard in full view of the transaction as it occurred. The Court notes that Greene later testified that all equipment was stored directly across the street in full view of Shaw's home such that one could easily discern what equipment was there.

The Debtor conceded that he did not inform the USDA of the sales, but opined that Shaw may have done so because Shaw "handled the paperwork." The Debtor also made a passing reference to obtaining security interest releases from the USDA, but it is not clear whether he personally did so, and whether releases were obtained for each asset sold.

At some point in 2006, the Debtor had moved from Shaw's property but continued to work with him there and on the farm. After the passing of Shirley Shaw (the Debtor's stepmother and Shaw's wife), Shaw began a relationship with Greene. Apparently, as Shaw's relationship with Greene flourished and culminated in marriage, his relationship with the Debtor soured. By 2007, the Debtor had ceased working with Shaw and was not on speaking terms with him because of Greene. Eventually, either Shaw or Greene—the record is not clear on this

point—obtained a restraining order preventing the Debtor from entering the farm. Thereafter, all communications between the two were relayed by Yvette Shaw.

In 2007, Shaw received by mail a notice from the USDA inviting him to extend the term of the 2003 FSA Loan to fifteen years. Ultimately, on January 26, 2007, the Debtor and Shaw executed the 2007 FSA Loan in the amount of $70,634.35 and a security agreement (the "2007 Security Agreement"), essentially refinancing the 2003 FSA Loan.[13] Like the 2003 FSA Loan, the 2007 FSA Loan was substantially over-collateralized in accordance with USDA requirements. Notably, the 2007 Security Agreement listed several items as Collateral Equipment that had been sold in 2004, including the Kristi trailer, the Ferris mower, and the Twose mower. According to an FSA Appraisal of Chattel Property dated July 20, 2005, the value of these items two years prior to the 2007 Security Agreement totaled $14,500.00.[14] Neither the MF Tractor nor the Chevrolet dump truck is listed as Collateral Equipment under the 2007 Security Agreement. Thus, it appears the only Collateral Equipment the Debtor actually owned at the time he executed the 2007 Security Agreement were two Dodge trucks and a Case tractor with a combined value of $24,000.00.[15] The Kenworth tractor truck, which the Debtor owned at the time, is not listed in the 2007 Security Agreement for reasons that were not explained at trial. In contrast, the approximate value of Shaw's collateral based on the same appraisal was $214,300.00.[16] As a result, nearly all the collateral securing the 2007 FSA Loan belonged solely to Shaw.

The evidence at trial established that the Debtor had no role in the loan application process and did not prepare the equipment list for the 2007 Security Agreement. The Debtor

---

[13] Exs. 3, 4.

[14] Ex. 11.

[15] See Exs. 4, 11.

[16] Id.

testified that Shaw prepared the loan application. Greene, on the other hand, insisted that Hale and Yvette Shaw had done so, but later conceded that she did not know whether Shaw assisted them as they "kept [Greene] out of it." In any event, the Debtor credibly testified that he signed the 2007 FSA Loan and 2007 Security Agreement at the USDA office in Concord, New Hampshire on his lunch break, without reading them, simply because Yvette Shaw directed him to do so. Shaw had already executed the loan documents separately at the farm before they were submitted to the USDA office.

     At trial, Greene claimed, without evidentiary support, that Shaw was forced into the 2007 FSA Loan against his will by Hale and Yvette Shaw on the threat that he would otherwise not inherit the farm upon their death. She testified that between October and December, 2006, the USDA had called and sent delinquency notices to Shaw's property because the Debtor had yet to make a payment, which angered Shaw because the Debtor received the full benefit of the 2003 FSA Loan. Shaw, according to Greene, did not want to extend the term of the 2003 FSA Loan, but instead wanted the Debtor to refinance the obligation on his own. It is undisputed, however, that the Debtor lacked the ability to refinance on his own. Greene insisted that Shaw believed that the Debtor "pledged honest collateral" in the 2007 Security Agreement, and that Shaw lacked the ability to verify what equipment the Debtor owned once the Debtor no longer stored his equipment at the farm.

     Shaw passed away on December 17, 2008, four months after executing a will disinheriting his children (including the Debtor) and naming Greene as his sole beneficiary. The Debtor and his sister filed a petition in the Merrimack County Probate Court contesting Shaw's will. The USDA then obtained a judgment in the Probate Court against Shaw's estate for the outstanding balance of the 2007 FSA Loan. At the time of the trial, Shaw's estate had not yet

10

paid this judgment, and it was the subject of an appeal. As a result of the judgment, on December 14, 2010, Greene brought a civil action against the Debtor in the Merrimack Country Superior Court seeking contribution. The civil action prompted the Debtor's schedule amendments and has been stayed by the reopening of the Debtor's bankruptcy case.

## IV. DISCUSSION

Section 523(a)(2)(B) of the Bankruptcy Code excepts from discharge any debt:

for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

* * *

(B) use of a statement in writing—

(i) that is materially false;

(ii) respecting the debtor's or an insider's financial condition;

(iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and

(iv) that the debtor caused to be made or published with intent to deceive . . .

11 U.S.C. § 523(a)(2)(B). To establish a debt is nondischargeable under this section, a creditor must prove:

(1) the debtor made a statement in writing; (2) the statement concerned the debtor's or an insider's financial condition; (3) the statement was materially false; (4) the creditor actually and reasonably relied on this false statement; and (5) the debtor made the false statement with the intent to deceive the creditor.

Douglas v. Kosinski (In re Kosinski), 424 B.R. 599, 608 (B.A.P. 1st Cir. 2010). The party contesting dischargeability must prove each element by a preponderance of the evidence. Grogan v. Garner, 498 U.S. 279, 291 (1991). "The statutory requirements for a discharge are

11

'construed liberally in favor of the debtor' and '[t]he reasons for denying a discharge to a bankrupt must be real and substantial, not merely technical and conjectural.'" Palmacci v. Umpierrez, 121 F.3d 781, 786 (1st Cir. 1997) (quoting Boroff v. Tully (In re Tully), 818 F.2d 106, 110 (1st Cir.1987)). For that reason, a creditor must demonstrate that its "claim comes squarely within an exception enumerated in Bankruptcy Code § 523(a)." Palmacci, 121 F.2d at 786 (quoting Century 21 Balfour Real Estate v. Menna (In re Menna), 16 F.3d 7, 9 (1st Cir.1994)).

For purposes of the oral motion, the Court will assume, *arguendo*, the existence of a debt for contribution despite the fact that Shaw's estate has yet to pay the USDA's judgment for the outstanding balance of the 2007 FSA Loan. From here, it is apparent that several elements of 11 U.S.C. § 523(a)(2)(B) are easily satisfied. For example, it is undisputed that the Debtor "obtained" a "refinancing of credit" by use of "a statement in writing." Moreover, to the extent that the 2007 Security Agreement pledged equipment as collateral that the Debtor no longer owned—the Kristi trailer, a Ferris mower, and the Twose mower—the 2007 Security Agreement contains false statements. Although the record clearly establishes that the Debtor did not prepare the equipment list, he nonetheless adopted the false statements contained within the 2007 Security Agreement by signing the document. Toye v. O'Donnell (In re O'Donnell), No. 11-02034-JBH, 2012 WL 10819892, at *7 (B.A.P. 1st Cir. Dec. 5, 2012). Nevertheless, Greene has failed to sustain her burden with respect to the remaining elements.

A. Statement of Financial Condition

To except a debt from discharge under 11 U.S.C. § 523(a)(2)(B), the aforementioned "statement in writing" must be "respecting the debtor's or an insider's financial condition." 11

12

U.S.C. § 523(a)(2)(B)(ii). Some courts have interpreted this phrase "broadly to include any statement that has a bearing on the financial position of the debtor," while others interpret it "narrowly so as to include only statements providing information as to a debtor's net worth, overall financial health, or an equation of assets and liabilities." See In re Kosinski, 424 B.R. at 608-09 (collecting cases). The United States Court of Appeals for the First Circuit has not ruled on the issue. Nevertheless, in In re Sansoucy, Judge Yacos concluded that, for purposes of 11 U.S.C. § 523(a)(2)(B)(ii), a statement "respecting the debtor's or an insider's financial condition" refers to "a balance sheet and/or profit and loss statement or other accounting of an entity's overall financial health and not a mere statement as to a single asset or liability." Bal-Ross Grocers, Inc. v. Sansoucy (In re Sansoucy), 136 B.R. 20, 23 (Bankr. D.N.H. 1992); see Sampson Lumber Co. v. Tucci (In re Tucci), 462 B.R. 278, 283 (Bankr. D. Mass. 2011); Danvers Savs. Bank v. Alexander (In re Alexander), 427 B.R. 183, 195 (Bankr. D. Mass. 2010); Northeast Credit Union v. Butterworth (In re Butterworth), 279 B.R. 31, 33 (Bankr. D.N.H. 2002); Zimmerman v. Soderlund (In re Soderlund), 197 B.R. 742 (Bankr. D.Mass. 1996); Benjelloun v. Robbins (In re Robbins), 178 B.R. 299, 304 (Bankr. D. Mass. 1995). This more restrictive interpretation comports with the requirement that exceptions to discharge are to be read narrowly, see Sharfarz v. Goguen (In re Goguen), 691 F.3d 62, 68 (1st Cir. 2012), and has been adopted by three out of four circuit courts of appeal that have considered the issue. Cf. Bandi v. Becnel (In re Bandi), 683 F.3d 671 (5th Cir. 2012); Cadwell v. Joelson (In re Joelson), 427 F.3d 700 (10th Cir. 2005); Rose v. Lauer (In re Lauer), 371 F.3d 406- (8th Cir. 2004) with Engler v. Van Steinburg, 744 F.2d 1060 (4th Cir. 1984). Therefore, applying this standard to the present case, it is clear that a statement that the Debtor owned three pieces of Collateral Equipment, by itself, speaks only to one component of the "equation of assets and liabilities" that

13

make up his "financial condition." In re Sansoucy, 136 B.R. at 23; but see Butler v. Roberts (In re Roberts), 54 B.R. 765, 771 (Bankr. D.N.D. 1985) (under the broad interpretation of financial statement, a materially false security agreement is a written statement pertaining to the debtor's financial condition). Accordingly, Greene has not sustained her burden under this element.

B. Material Falsity

Section 523(a)(2)(B) of the Bankruptcy Code requires not only that a statement be false, but "materially" false. 11 U.S.C. § 523(a)(2)(B)(i). A statement is materially false "if it 'paints a substantially untruthful picture of a financial condition by misrepresenting information of the type which would normally affect the decision to grant credit. . . .'" HP Family Fed. Credit Union v. Oakley (In re Oakley), No. 99-10013-JMD, 1999 WL 33457792, at *2 (Bankr. D.N.H. Oct. 15, 1999) (quoting Northmark Bank v. Herzog (In re Herzog), 140 B.R. 936, 938 (Bankr. D. Mass. 1992)). Thus, materiality is not assessed on the basis on the relative size of the error, but to the degree that it distorts the debtor's financial picture. Abramov v. Movshovich (In re Movshovich), 521 B.R. 42, 61 (Bankr. D. Mass. 2014). Because the Court has determined that the 2007 Security Agreement was not a statement of financial condition within the meaning of 11 U.S.C. § 523(a)(2)(B)(ii), the Court cannot find, as a matter of law, that the falsity of statements therein was material for purposes of 11 U.S.C. § 523(a)(2)(B)(i).

C. Actual and Reasonable Reliance

For a debt to be non-dischargeable under 11 U.S.C. § 523(a)(2)(B), "the court must first determine that the creditor actually relied on the false statement, and then, that the reliance was objectively reasonable." In re Kosinski, 424 B.R. at 610. To prove actual reliance, "it is enough

14

if the misstatement or omission is a 'substantial factor' in the decision to make or renew a loan." Shawmut Bank, N.A. v. Goodrich (In re Goodrich), 999 F.2d 22, 25 (1st Cir. 1993). Reasonableness, in contrast, is measured by reference to the circumstances surrounding the transaction. In re Menna, 16 F.3d 7, 11 (1st Cir. 1994) (explaining that determination of reasonable reliance is an issue of fact), overruled on other grounds by Field v. Mans, 516 U.S. 59, 70–71 (1995). Indicia of reasonableness include:

> (1) whether the creditor had a close personal relationship or friendship with the debtor; (2) whether there had been previous business dealings with the debtor that gave rise to a relationship of trust; (3) whether the debt was incurred for personal or commercial reasons; (4) whether there were any "red flags" that would have alerted an ordinarily prudent lender to the possibility that the representations relied upon were not accurate; and (5) whether even minimal investigation would have revealed the inaccuracy of the debtor's representations.

In re Kosinski, 424 B.R. at 611 (quoting Middlesex Sav. Bank v. Flaherty (In re Flaherty), 335 B.R. 481, 491 (Bankr. D. Mass. 2005)). Here, the Court finds that Shaw neither actually nor reasonably relied on the false statements contained in the 2007 Security Agreement.[17]

First, the unrebutted testimony is that Shaw advised the Debtor to sell some Collateral Equipment, particularly the MF Tractor, and witnessed at least one of the two sales while working in the yard. While the Court notes that the sales in question took place years before Greene ever came to Shaw's Property, her testimony that all equipment was stored directly across the street in full view of Shaw's home in 2006 bolsters the Debtor's assertion that Shaw was aware of the sales. The equipment sold—a farm tractor, two mowers, a dump truck, and a trailer—are fairly large items whose disappearance was likely to have been noticed. Because these sales took place in 2004, two years before the Debtor left Shaw's Property, there is no suggestion, let alone evidence, that the Debtor stored his equipment anywhere else at that time.

---

[17] Reliance, however, is not vitiated simply because Shaw executed the 2007 FSA Loan and 2007 Security Agreement before the Debtor adopted the false statements contained therein, because the transaction was incomplete until both borrowers signed the documents.

15

For these reasons, the Court finds that it is more likely than not that Shaw knew that the Debtor had sold some of the Collateral Equipment in 2004, and therefore, could not have actually relied on their erroneous inclusion on the 2007 Security Agreement.

The Court also finds it unlikely that the Debtor's pledge of collateral to secure the 2007 FSA Loan was a "substantial factor" in Shaw's decision to complete the transaction. Shaw was already a co-obligor on the 2003 FSA Loan which was secured by his equipment, the dairy's livestock, and all crops that could be grown on the farm. Moreover, he knew the Debtor consistently struggled to make the payments under the 2003 FSA Loan and was delinquent in his payments by late 2006. Under these circumstances, Greene's contention that Shaw would have refused to extend the term of the 2003 FSA Loan in January, 2007, had he known that the value of the Debtor's actual pledge of collateral was only $24,000.00, strains credulity. The value of the sold assets would have been irrelevant in 2007 because the sales took place three years earlier, and therefore, those assets were not available to satisfy any part of the 2003 FSA Loan. In reality, Shaw's refusal to execute the 2007 FSA Loan would only have resulted in the same exposure of his collateral, but with a closer maturity date.

Alternatively, even assuming, *arguendo*, that Shaw did rely on the Debtor's representations in the 2007 Security Agreement, his reliance was not reasonable as he conducted no investigation into their veracity. While a familial relationship might, under other circumstances, relieve a party of such a requirement, the relationship between Shaw and the Debtor had completely broken down by 2007, as evidenced by the existence of a restraining order and the necessity to route all communications through Yvette Shaw. The restraining order may have complicated matters, Greene failed to establish that Shaw's complete inaction was reasonable under the circumstances.

In sum, Greene has not sustained her burden to demonstrate reasonable reliance.

D. Intent to deceive

The final element of 11 U.S.C. § 523(a)(2)(B) requires the creditor to prove that the debtor made the false statement with the intent to deceive the creditor. 11 U.S.C. § 523(a)(2)(B)(iv); see In re Kosinski, 424 B.R. at 608. Based on the Debtor's unrebutted, credible testimony, the Court has already found that it is more likely than not that Shaw knew that the Debtor had sold some of the Collateral Equipment in 2004. Thus, given Shaw's knowledge of the sales and the Debtor's awareness of that knowledge, as well as the Debtor's belief that Shaw prepared the equipment list, the Court finds it unlikely that the Debtor adopted the false statements with the intent to deceive Shaw.

Alternatively, even if the Court were to assume, *arguendo*, that Shaw was not aware of the equipment sales in 2004, his own apparent recklessness in executing the 2007 Security Agreement undercuts any inference that could be drawn against the Debtor. See generally In re O'Donnell, 728 F.3d at 47 ("intent to deceive under section 523(a)(2)(B) may be demonstrated by the debtor's knowledge of, reckless indifference to, or reckless disregard for the written statement's falsity"); In re Coughlin, 27 B.R. 632, 636 (B.A.P. 1st Cir. 1983) ("Intent to deceive is present when the debtor has seen the financial statement and the errors were such that he knew or should have known of their falsity.") (internal quotation marks omitted); In re Oakley, 1999 WL 33457792, at *4 ("For purposes of § 523(a)(2)(B), an intent to deceive can be inferred when it is shown that the relevant debtor knew that the financial statement was false or was reckless in not knowing of such falsity."). "It is old hat that a court called upon to do equity should always consider whether the petitioning party has acted in bad faith or with unclean hands." Texaco

17

Puerto Rico, Inc. v. Dep't of Consumer Affairs, 60 F.3d 867, 880 (1st Cir. 1995). Thus, it would be inappropriate to draw an inference in Shaw's favor—that the Debtor's reckless ignorance of the truth evidences an intent to deceive Shaw—where the record indicates the same inference could be drawn against him based on the same reckless conduct.

**V. CONCLUSION**

For the reasons stated above, Greene has not sustained her burden and the Debtor is entitled to judgment as a matter of law. Accordingly, the Debtor's oral motion is granted and the Court will enter a separate judgment in his favor. This opinion constitutes the Court's findings of fact and conclusions of law in accordance with Fed. R. Bankr. P. 7052.

ENTERED at Manchester, New Hampshire.


Dated: April 25, 2016 /s/ Bruce A. Harwood
Bruce A. Harwood
Chief Bankruptcy Judge